# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

v.

**ROBERT DUANE WALKER,**

    **Defendant.**

Case No. 2:12-CR-54

Judge Peter C. Economus

**OPINION AND ORDER**

This matter is before the Court for consideration of Plaintiff United States' Motion for Reconsideration. (Doc. # 25.) Defendant Robert Walker filed a memorandum contra (doc. # 26) to which Plaintiff filed a reply (doc. # 27). The government asks this Court to reconsider its decision granting Defendant's Motion to Suppress as set forth in its Opinion and Order of June 4, 2012 (doc. # 23). For the following reasons, the government's motion is **DENIED**.

## I. Facts

This Court reiterates the facts set forth in its Opinion and Order:

> On February 21, 2009, during the early morning hours, a van passed Columbus Police Department Sergeant Dana Norman who was travelling westbound on Interstate I-70. At that time, Sgt. Norman was "just driving around" to "see what[ was] going on" around the city. (Tr. page 67.) Although uncertain of his own speed, Sgt. Norman believed the van to be speeding, and he notice that the van cut sharply in front of him to make the exit at Livingston Avenue. (*Id.*, page 68.) Sgt. Norman had not received any calls about the van, nor did he hear any calls about the van over the police radio, but he elected to follow the van on the bases of its speed and what appeared to him to be a hasty exit. (*Id.*, page 70.) His "first thought was this van, whoever was driving this vehicle, was probably a good possibility of being a drunk driver by driving that erratic." (*Id.*, page 71.) The "erratic" driving, according to Sgt. Norman,

was the undetermined rate of speed and its exit "off of the freeway down that ramp down to Livingston Avenue[.]"

> Well, this van is either involved in – it's either – The first possibility of thought would be drunk driver, or being the fact that I'm involved in homicide investigations, this van *could* have been involved in some type of activity, at that time of morning, a shooting, fleeing from somebody. *I have no idea*.

(*Id.*, page 71; *see also,* pages 88-89; emphasis added.) Sgt. Norman later testified that he did not know of any criminal activity related to the van or its driver, only that he suspected a traffic violation had been committed. (Tr., page 86-87.)

Sgt. Norman continued to follow the van down Livingston Avenue and down several side streets. He testified that the van was "definitely speeding more than 35 miles an hour, going back and forth across the lanes in traffic." (*Id.*, page 72; *see also* page 91, "I don't know how fast he was going down Livingston Avenue. It was more than 35 miles an hour.") Because Sgt. Norman was in an unmarked car, he was not able to stop the van, so he contacted uniformed officers over the police radio. (*Id.,* page 73.) As he followed the van down Heyl Avenue, he radioed again, noting that the van was navigating through the narrow Heyl Avenue where cars were parked on both sides. (*Id.*, page 73.) He radioed two more times as he continued to follow onto various side streets. (*Id.*, pages 75-79.) Eventually, he stopped on Whittier Avenue where the van was parked. (*Id.*, pages 78-79.) There, Sgt. Norman saw the driver exit the van and go up on the porch of 815 Whittier Avenue.[1] Even though Sgt. Norman testified that he did not know that any criminal activity had transpired, he "tried to stop [Defendant] from eluding the police." (*Id.*, page 86.) Sgt. Norman got out of his car, followed the driver onto the porch, and verbally identified himself as a police officer while holding

---

[1] The residence at 815 Whittier Avenue belongs to Defendant's mother and is where he frequently stays and where, that night, his daughter was visiting. (Tr., page 36.)

open his coat to show the police badge on his belt buckle.[2] The driver, later identified as Defendant Robert Walker, did not stop; instead, he jumped over the porch railing and ran behind the house. (*Id.*, page 85.) Defendant testified that although he had noticed a white car following him soon after he exited onto Livingston Avenue, he did not know the driver was a police officer. (*Id.* at pages 40-48.) Sgt. Norman followed and grabbed Defendant by the back of his coat. Defendant pulled away and continued behind the house. At this point, uniformed officers appeared on the property, and they tasered, handcuffed and arrested Defendant. (*Id.,* page 99, 115.) Defendant was searched, and a uniformed officer found a handgun in Defendant's pocket. (*Id.*, pages 115-16.) All of these events took place at 815 Whittier Avenue.

## II. Standard of Review

"Although the Federal Rules of Criminal Procedure do not specifically recognize a motion to reconsider, such motions are generally reviewed under the same standards applicable to a civil motion to alter or amend judgment pursuant to Fed. R. Civ. P. 59(e)." *United States v. Gomez-Gomez*, 2010 WL 200278 (S.D. Ohio, Jan. 13, 2010), *affirmed by United States v. Gomez-Gomez*, 643 F.3d 463 (6th Cir. 2011) (internal quotation marks and citation omitted). A motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e) may be granted only where there is "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Intera Corp. v. Henderson,* 428 F.3d 605, 620 (6th Cir.2005); *see also Huff v. Metro. Life Ins. Co.,* 675 F.2d 119, 122 (6th Cir.1982) (noting that a motion for reconsideration "generally is treated as a motion to alter or amend judgment pursuant to Fed.R.Civ.P. 59(e)).

---

[2] In its post-hearing memorandum, the government describes Sgt. Norman as wearing a "cotton shirt and tie." (Doc. # 22, page 5.) In fact, Sgt. Norman testified, "I had a coat on, a heavy coat on, and a vest. And I just flung my coat back like this to show that I had a badge on." (Tr., page 84.)

### III. Fourth Amendment

The Fourth Amendment states,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

However, "a police officer may stop an individual, question him, and perform a carefully limited pat down search for weapons where the officer reasonably concludes that criminal activity may be afoot." *United States v. Harris*, 192 F.3d 580, 584 (6th Cir. 1999) (citing *United States v. Terry*, 392 U.S. 1, 30 (1968)). The government argues that the Court erred in determining that Sgt. Norman never effectuated a traffic stop (*id.*, pages 15 – 18); and that the Court erred in determining "what happened after the initial encounter at the porch" (*id.*, pages 18 – 24).

### A. Traffic stop

In its motion for reconsideration, the government re-visits the issue of whether Sgt. Norman could have effectuated a traffic stop by focusing on the issue of Defendant's alleged speeding: "As far as the Fourth Amendment is concerned, Sgt. Norman could have arrested the defendant simply for speeding." (Motion, pages 15 – 16.) Yet, whether Defendant was speeding that night was not established clearly, as the testimony at the evidentiary hearing was contradictory, and no other evidence was presented. Sgt. Norman testified that he was not sure of his ***own*** speed—he was driving "***probably*** 65, 70 miles an hour"—when Defendant's van passed him to reach the Livingston Avenue exit. (Tr. page 68, emphasis added.) The government's counsel himself emphasized that Sgt. Norman "was not able to know the precise speed of the car." (*Id.* at page 69.) Sgt. Norman offers vague assertions of his own speed and extrapolates Defendant's speed from that unreliable baseline. In addition, he offers equally

4

imprecise descriptions of Defendant's travels, such as "at a very good speed" and "reckless." (Tr., page 74.) Sgt. Norman's attention was caught as much by the type of vehicle, apparently— "a big conversion type van, which we don't see a lot of conversion vans anymore" (*id.*, page 68)—as it was by the van's passing his vehicle. Not only was Sgt. Norman unsure of Defendant's speed, he was equally vague about any other supposed criminal activity:

> Well, this van is either involved in—it's either—The first possibility of thought would be a drunk driver, or being the fact that I'm involved in homicide investigations, this van could have been involved in some type of activity, at that time of morning, a shooting, fleeing from somebody. ***I have no idea.***

(*Id.* at page 71, emphasis added.) According to the sergeant, Defendant was "weaving back and forth on the lanes" of Livingston Avenue and side streets, but as indicia of drunk driving, that description is lacking, as it could as easily comport with Defendant's testimony that he was changing lanes to determine if someone were following him. (Tr., pages 44 – 45.) Further, Sgt. Norman offered nothing more other than it was "obvious" to him that "***something*** was wrong here." (Tr., page 74, emphasis added.)

This Court finds that Sgt. Norman's basis for suspecting Defendant of a traffic violation—whether due to alleged speed or alleged intoxication or any other criminal activity—is as unreasonable now as it was when the Court first evaluated the testimony in court and issued its Opinion and Order. The government's attempt to re-cast the facts in a different light does not change the obvious: Sgt. Norman had "no idea" why he was following Defendant and had no specific factual basis to support either reasonable suspicion or probable cause. As a result, this Court denies the government's motion for reconsideration in this regard.

### B. The Porch

Even though this Court has found that Sgt. Norman's detention of Defendant was unlawful, what the government suggests is that the officer's detention of Defendant was purged

5

of its illegal taint by the intervening circumstance of Defendant's "flight." (Motion, pages 20 – 25.) In support, the government cites to *United States v. Beauchamp*, 659 F.3d 560 (6th Cir. 2011), *United States v. Castillo*, 238 F.3d 424 (6th Cir. 2000) (unreported), and *United States v. Jefferson*, 182 F.3d 919 (6th Cir. 1999) (unreported). The government points to *Beauchamp* for the proposition that "if a suspect's response to an illegal stop is a new and distinct crime, such as flight or use of force, any evidence recovered incident to the arrest for the subsequent crime is not tainted by the unlawfulness of the initial detention." 659 F.3d at 574. With regard to the issue presented here, *Beauchamp* is not entirely relevant, as there the issue was whether Defendant Beauchamp's consent to search was voluntary.[3] Notably, though, other facts from *Beauchamp* are similar to those here:

> [T]he purpose and flagrancy of the officers' conduct do not tend to dissipate the taint [of an unconstitutional seizure]. This is an important factor because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct. While the officers' conduct in this case may not qualify as flagrant, the purpose of the stop seems to be investigatory, undertaken as an expedition for evidence in the hope that something might turn up. Officer Fain did not stop until he found something to pin on Beauchamp. He did not engage Beauchamp in a consensual encounter. He did not have reasonable suspicion to stop and detain him. Even if the stop had been had been legal, the district court found that he did not have probable cause until after he pulled back Beauchamp's underwear on a public street and looked inside. As we have previously explained, this type of police misconduct— stopping a suspect without probable cause for investigatory purposes—is precisely the type of conduct that *Brown* [*v. Texas*, 443 U.S. 47 (1979)] and its progeny seeks to deter.

*Beauchamp*, 659 F.3d at 574 (internal quotation marks and citations omitted). Here, too, Defendant was not engaged in a consensual encounter, Sgt. Norman lacked reasonable suspicion

---

[3] In *Beauchamp*, the Sixth Circuit found that the defendant's struggle with the police officers did not serve as an intervening circumstance "because it did not come between the illegal seizure and the discovery of the evidence." 659 F.3d at 574.

to stop him, and he had no reasonable suspicion for investigatory purposes. Even at the time Defendant left the porch to go around the house, Sgt. Norman had "no direct information there was any [criminal] activity." (Tr., page 87.) While this Court stops short of comparing Sgt. Norman's pursuit to Officer Fain's "expedition for evidence in the hope that something might turn up," it recognizes the similarities.

The other two cases—*Castillo* and *Jefferson—*are easily distinguishable. First, the suspects in those cases fled from uniformed officers in marked cars, and secondly, the suspects were stopped on public streets. Third, the intervening circumstance in each of these cases was evident: Castillo "jumped" into his car and led the police on a high-speed chase, and Jefferson struck an officer while attempting to run away. There is no such intervening circumstance here—no high-speed chase, no violent contact on an officer.

The government also argues that because Defendant did not respond to Sgt. Norman's order to stop, "the reasonable suspicion elevated to probable cause to arrest, which, in turn, conveyed authority to conduct a search incident to arrest." (Motion, page 22.) This argument fails, too, as it is predicated on the existence of reasonable suspicion—which, this Court as already held, was not present. Without reasonable suspicion, Sgt. Norman had *no* basis for detaining or attempting to detain Defendant; ergo, Defendant's failure to stop is not the equivalent of flight.

The same is true with regard to the uniformed officer. The reason the uniformed officers were at 815 Whittier Avenue was in response to Sgt. Norman's calls. Each time Sgt. Norman called in, he was seeking uniformed assistance to detain a traffic-law violator. (Tr., pages 72 – 73, 74, 78, 82, 90, 92.) Patrol officers were on their way to assist Sgt. Norman before he reached 815 Whittier Avenue. (Tr., page 78, 81, 82.) The only basis ever provided by Sgt. Norman—

according to his testimony and the evidence before this Court—is that he radioed in for uniform support regarding a traffic violation, either speeding or driving under the influence.

> Q. And to your knowledge, did they—To your knowledge, did they arrive at the scene in response to your calls?
>
> A. Yes, they did.
>
> Q. And why did you call the uniform officers, Sergeant Norman?
>
> A. I called them for—to stop this vehicle because of his erratic driving for possible drunk driving.
>
> (Tr., page 90.)

According to his testimony, the last time Sgt. Norman radioed in to uniformed patrol was just before he left his unmarked car parked "on the south side of Whittier Street." (Tr. 82) There were only seconds between Defendant's abbreviated encounter with Sgt. Norman and his encounter with Officer Hall. When Officer Hall arrived at 815 Whittier Avenue, he did not see Sgt. Norman, but he entered the backyard of the property in response to "rattling" noises. (Tr., page 98.) Thereafter, he "*immediately* came in contact with the defendant." (Tr., page 98, emphasis added.) Officer Hall had his gun drawn, although he did not see any weapon in Defendant's hands. (Tr., pages 98 and 109.)

The government insists that Defendant's "flight from the orders to stop" gave the uniformed officers probable cause to arrest him for obstruction of official business, but there is little offered in support of that claim. The government mischaracterizes the situation when it states that Officer Hall "was not responding to suspected traffic violations at all, but to calls of 'officer needs assistance' and then 'officer in trouble.'" (Motion, page 24, citing Tr., page 95.) This statement ignores Sgt. Norman's repeated testimony that his radio calls were for assistance in stopping Defendant for alleged traffic violations. That Defendant did not immediately

8

respond to Officer Hall's order—a disputed fact—is insufficient to create a new and separate crime capable of purging the taint of Sgt. Norman's unconstitutional stop. As a result, this Court hereby denies the government's motion with regard to its second issue, "what happened after the initial encounter on the porch."

## IV. Conclusion

Based on the foregoing, this Court hereby **DENIES** the United States' Motion for Reconsideration (doc. # 25) in its entirety.

**IT IS SO ORDERED.**


                                      **/s/ Peter C. Economus** _____
                                      **PETER C. ECONOMUS**
                                      **UNITED STATES DISTRICT JUDGE**